## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| URBAN 2004 HOLDING COMPANY, an Illinois corporation, | ) ) ) | Case Number: _____ |
| Plaintiff, | ) ) | |
| vs. | ) ) | **Jury Trial Demanded** |
| NATIONWIDE AFFORDABLE HOUSING FUND 27, LLC, an Ohio limited liability company, SCDC, LLC, an Ohio limited liability company, and WENTWOOD CAPITAL ADVISORS, LP, a Texas limited partnership, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Urban 2004 Holding Company ("Urban" or "Plaintiff"), for its Complaint against Defendants Nationwide Affordable Housing Fund 27, LLC ("Investor Limited Partner" or "ILP"), SCDC, LLC ("Special Limited Partner" or "SLP") (collectively, the ILP and SLP are referred to as "Limited Partners"), and Wentwood Capital Advisors, LP ("Wentwood" and together with the Limited Partners, "Defendants") state and allege as follows:

## <u>INTRODUCTION</u>

1.     In 2004, Urban Florence I LP (the "Florence I Partnership") was formed for the purpose of acquiring, rehabilitating, developing, improving, owning, maintaining, and operating a 155-unit affordable housing development, then-known as Florence Christian Homes Apartments Phases I and II (now Arcadia Park I and II) (the "Florence I Project").

2.     The Florence I Project is located in Florence, Kentucky, and provides housing for low-income households headed by either persons age 62 or older, or by physically handicapped persons capable of independent living, pursuant to the restrictions set forth in the Low-Income

1

Housing Tax Credit ("LIHTC") program (26 U.S.C. § 42 *et seq.* ("Section 42")), a federal Housing Assistance Payment ("HAP") contract, and a Regulatory Agreement with the Kentucky Housing Corporation ("KHC").

3.      Urban, Urban-KY LP ("Urban-KY"), SLP, and a predecessor to the ILP executed an Agreement of Limited Partnership, dated as of April 1, 2005 (the "Florence I Partnership Agreement"), providing for the operation of the Florence I Partnership.  Upon information and belief, a true and correct copy of the Florence I Partnership Agreement, inclusive of exhibits, is attached hereto as **Exhibit A**.

4.      Urban is the general partner of the Florence I Partnership.  Urban-KY is the Class A Limited Partner.  Urban and Urban-KY are affiliates that share common ownership.

5.      In 2004, Urban Florence II LP (the "Florence II Partnership" and together with the Florence I Partnership, the "Partnerships") was formed for the purpose of acquiring, rehabilitating, developing, improving, owning, maintaining, and operating a 60-unit affordable housing development known as Florence Christian Homes, Phase III (the "Florence II Project," and together with the Florence I Project, the "Projects").

6.      The Florence II Project is located in Florence, Kentucky, and provides housing for low-income households headed by either persons age 62 or older, or by physically handicapped persons capable of independent living, pursuant to the restrictions set forth in the LIHTC program under Section 42, a federal HAP contract, and a Regulatory Agreement with the KHC.

7.      Florence Christian Services III, Inc., a Kentucky corporation (the "Florence II GP"), Urban, Urban-KY, SLP, and a predecessor to the ILP executed an Agreement of Limited Partnership, dated as of April 1, 2005 (the "Florence II Partnership Agreement," and together with the Florence I Partnership Agreement, the "Partnership Agreements"), providing for the operation

of the Florence II Partnership. Upon information and belief, a true and correct copy of the Florence II Partnership Agreement, inclusive of exhibits, is attached hereto as **Exhibit B**.

8. The Florence II GP is the general partner of the Florence II Partnership. Urban-KY is the Class A Limited Partner. Urban is the Class B Limited Partner. Florence II GP, Urban-KY and Urban are all affiliates that share common ownership and/or control.

9. Urban-KY was originally the sole limited partner of both Partnerships. Urban-KY became the Class A Limited Partner in each Partnership pursuant to the Partnership Agreements.

10. Red Capital Tax Credit Fund XV, LLC was the original Investor Limited Partner of both Partnerships.

11. Upon information and belief, the interests of Red Capital Tax Credit Fund XV, LLC, and/or its successors, were acquired by Nationwide Affordable Housing 27, LLC (the ILP), which is the current Investor Limited Partner of both Partnerships.

12. Upon information and belief, Wentwood currently manages the ILP's interests in the Partnerships.

13. SCDC, LLC, (the SLP) is the Special Limited Partner of both Partnerships.

14. Upon information and belief, in 2012, an affiliate of Wentwood acquired and currently owns 100% of the equity interests in and obligations owed by the SLP.

15. Wentwood is what is known as an "aggregator" in the LIHTC industry. An aggregator collects investor interests in LIHTC deals and then challenges the contractual transfer rights for the LIHTC projects after the 15-year compliance period has ended with the goal of extracting additional profits out of the deals, profits that were not negotiated for, expected, nor intended by the original participants in the transaction. Aggregators, like Wentwood, use a variety

of methods, such as forcing protracted litigation and leveraging economies of scale to, and in hopes of, overwhelming their counterparts.

16.     In connection with such activities, Wentwood, among others, was recently sanctioned in an action against an affiliate of Urban as a result of its litigation-related tactics in another LIHTC transfer dispute in this district. *See Urban 8 Fox Lake Corporation, et al. v. Nationwide Affordable Housing Fund 4, LLC, et al.*, Case No. 18 C 6109, 2020 WL 201065 (N.D. Ill. Jan. 13, 2020).

17.     According to Wentwood, it has a nationwide presence as an aggressive manager of LIHTC investments seeking to maximize investor's equity investments in LIHTC properties and, in so doing, aligns its interest with those of its investors rather than the underlying objectives of the LIHTC program or corresponding projects.

18.     For more than fifteen years, and with Wentwood being the exception, the parties to this action and their predecessors operated pursuant to the understanding that the contracts permitted the Investor Limited Partner to receive numerous tax credits and other benefits over the course of a 15-year compliance period, and that Urban, or its assigns, held options to purchase the Limited Partners' interests in the Partnerships at the conclusion of the fifteen years. Urban has satisfied all conditions precedent and properly exercised its options.

19.     Now that the Investor Limited Partner has received the full benefit of the tax credits it expected to receive, with no risk that those tax credits will be recaptured, thus realizing the full benefit of its bargain, and now that Urban has duly exercised its option to purchase the Limited Partners' interests in the Partnerships, Defendants are (i) refusing to honor Urban's exercise of its purchase options; (ii) breaching the Partnership Agreements; (iii) refusing to work or cooperate in good faith with Urban in the exercise and consummation of its purchase options; and (iv)

frustrating and preventing Urban's contractual rights and ability to purchase the Limited Partners' interests in the Partnerships, and are causing harm to the Projects and Urban as a result.

20. Because Urban has properly exercised its purchase options to acquire the Limited Partners' interests in the Partnerships and delivered the requisite valuation reports, and because Defendants are bound to comply with the terms of the Partnership Agreements (which were drafted by the Limited Partners) and cooperate in the exercise of Urban's purchase options, but are refusing to do so, Urban brings this action seeking, among other things, to protect and enforce its rights and obtain, among other things, specific performance and damages.

## PARTIES

21. Urban is an Illinois corporation and is the sole General Partner of the Florence I Partnership and the Class B Limited Partner of the Florence II Partnership. Urban's principal place of business is located at 853 North Elston Avenue, Chicago, Illinois 60642.

22. Nationwide Affordable Housing Fund 27, LLC, is the Investor Limited Partner of both Partnerships. Nationwide Affordable Housing Fund 27, LLC, is an Ohio limited liability company, whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.

23. Upon information and belief, Nationwide Affordable Housing Fund 27, LLC's managing member is Wentwood ORC Advisors, LLC, an Ohio limited liability company and an affiliate of Wentwood, and whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.

24. Upon information and belief, Wentwood ORC Advisors, LLC is wholly owned by an Ohio limited liability company with its principal place of business in Texas, that is, in turn, owned by: (a) a Texas corporation with its principal place of business in Texas; (b) a limited liability company entirely owned by individuals who are citizens of Texas and Ohio, and a Texas

corporation with its principal place of business in Texas; (c) a Texas limited partnership that is owned by another Texas limited partnership, the partners of which are individuals residing in Texas; and (d) a Texas limited partnership, which is owned by two Texas limited liability companies (which are owned by another Texas limited liability company, that is owned by a Texas trust, which is controlled by trustees who are individuals residing in Texas), a Texas limited partnership (whose sole partner is a Texas trust, which is controlled by trustees who are individuals residing in Texas), and two Texas trusts, which are controlled by trustees who are individuals residing in Texas.

25.     Upon information and belief, Nationwide Affordable Housing Fund 27, LLC has one non-managing member, which is an Ohio limited liability company that is, in turn, owned by a Colorado corporation with its principal place of business in Colorado and an Ohio corporation with its principal place of business in Ohio.

26.     SCDC, LLC, is the Special Limited Partner of both Partnerships.  SCDC, LLC, is an Ohio limited liability company, whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.

27.     SCDC, LLC's sole member is Wentwood ORC Advisors, LLC, which is owned as described above in paragraph 24.

28.     The Florence I Partnership is a Delaware limited partnership that was organized solely to acquire, rehabilitate, develop, improve, own, maintain, and operate the Florence I Project. The Florence I Partnership's principal place of business is located at 853 North Elston Avenue, Chicago, Illinois 60642.

29.     The Florence II Partnership is a Delaware limited partnership that was organized solely to acquire, rehabilitate, develop, improve, own, maintain, and operate the Florence II

Project. The Florence II Partnership's principal place of business is located at 853 North Elston Avenue, Chicago, Illinois 60642.

30.     Wentwood is a Texas limited partnership. Wentwood's principal place of business is 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.

31.     Wentwood's partners are: (1) two individuals residing in Texas; (2) a Texas corporation with its principal place of business in Texas; and (3) a Texas partnership whose members are two individuals residing in Texas and a Texas corporation with its principal place of business in Texas.

32.     Wentwood provides asset management and other services to corporate investors and related companies on low-income housing tax credit equity investments, reportedly managing $7 billion in investments in 47 tax credit funds throughout the United States.

33.     Wentwood also reportedly owns and/or manages thousands of units in multifamily properties across 42 states and acts as a property management agent.

34.     Upon information and belief, Wentwood is the contractual asset manager for the Limited Partners and is the Limited Partners' agent, and its compensation is, in part, performance based.

## JURISDICTION, VENUE, AND CHOICE OF LAW

35.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between all Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000 for the Plaintiff.

36.     Jurisdiction and venue are proper in this Court because in the Partnership Agreements, the parties agreed that any suit arising from the Partnership Agreements could be brought in the United States District Court for the Northern District of Illinois, and the parties consented to jurisdiction in this Court.

37. This Court has personal jurisdiction over Wentwood because, among other reasons, Wentwood has regularly communicated with Urban in Illinois, manages the Limited Partners' interests in the Projects, has knowingly caused harm to an Illinois corporation as a direct result of its conduct, and otherwise routinely transacts business in and/or affecting Illinois.

38. Specifically, Wentwood has an ongoing business relationship with Urban that extends beyond the Projects, including other affordable housing developments located in Illinois and elsewhere. Considering its familiarity with Urban, Wentwood knew Urban was an Illinois corporation with its principal place of business in Illinois. Thus, when Wentwood was negotiating with Urban concerning Urban's exercise of its purchase options for the Projects, Wentwood knew its conduct would have an effect on Urban in Illinois. Wentwood nonetheless intentionally and tortiously interfered with the Partnership Agreements by preventing the Limited Partners from selling their interests in the Partnerships to Urban pursuant to the terms of the purchase options. In so doing, Wentwood was acting in its own economic self-interest to maximize its cash return and secure benefits not provided for or contemplated by the Partnership Agreements.

39. Wentwood is also party to two additional litigations in this District involving affiliates of Urban and its interference with the transfer rights of other LIHTC projects. In one of those proceedings, Wentwood sought dismissal based on lack of personal jurisdiction; that motion was denied. *See Urban 8 Fox Lake Corporation, et al. v. Nationwide Affordable Housing Fund 4, LLC, et al.*, Case No. 18 C 6109, Doc. 51 (N.D. Ill. Dec. 10, 2018).

40. Furthermore, as manager of the ILP's interests in the Partnership and owner of 100% of the equity interests in and obligations owed by the SLP, Wentwood knew of the Partnership Agreements, which expressly provided for jurisdiction in this Court.

41.     In light of the foregoing, Wentwood knew or should have anticipated that by causing the Limited Partners to breach their purchase option obligations under the Partnership Agreements to the detriment of Urban, it would be subjecting itself to the jurisdiction of this Court.

42.     Per their terms, the Partnership Agreements shall be construed and enforced in accordance with the laws of the State of Delaware.

## ALLEGATIONS

### I.     The Low-Income Housing Tax Credit (LIHTC) Program.

43.     The low-income housing tax credit ("Tax Credit") is a federal tax credit that is generated from certain multi-unit housing projects that satisfy a number of requirements, that include, without limitation, an agreement by the property owner to only rent certain qualified units to households with incomes below certain qualified limits at rents that do not exceed certain federally-mandated maximums for a period of at least 15 years after the property is placed in service (the "Compliance Period").

44.     The Tax Credit program is governed by Section 42, certain Treasury Regulations, guidance from the United States Department of Treasury and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated housing agencies in each state (collectively, the "Tax Credit Rules").

45.     In a typical low-income housing project, the project owner is organized as a limited partnership or limited liability company, the managing general partner owns a *de minimis* interest in the fee owner entity but controls the day-to-day operations of the project, and a third-party tax credit investor is admitted as an investor limited partner, agreeing to contribute capital to the owner entity in exchange for an allocation of substantially all of the Tax Credits available to the project owner and certain other expected tax benefits.

46.     The Tax Credit Rules provide that only the project owner of a qualified low-income housing project can qualify for and receive Tax Credits, and only if the project owner meets certain terms and conditions and guarantees the continuation of these requirements for the duration of the Compliance Period, or as extended.

47.     The project owner collects the Tax Credits over a ten-year period, but remains obligated to maintain the low-income rents during the fifteen-year Compliance Period.  By the end of the Compliance Period, the project owner has collected all Tax Credits available to the project and other tax benefits.  As a result, by the end of the Compliance Period, the investor limited partner has realized the vast majority of economic benefits it bargained for and expected from the project and further expects to exit the partnership near or following the expiration of the Compliance Period.

48.     A purchase option is often one of the primary economic incentives for the managing general partner in a typical low-income housing project.

49.     While the investor limited partner receives a substantial yearly return on its investment over ten years in the form of Tax Credits and other economic benefits, the managing general partner or an affiliate of it manages the project during the Compliance Period for fees, which are traditionally required to be deferred and paid out from project cash flows, during the Compliance Period.

50.     The managing general partner or an affiliate of it is also the guarantor of the flow of Tax Credits, any negative adjustors, and operating losses, so the managing general partner or its affiliate assumes significant risk in the project.

51.     The managing general partner undertakes its investment of time, resources and money, as well as its duties and obligations, with the expectation that it will have the option and

right to acquire the investor limited partner's interest in the operation of the business as a going-concern or acquire the real estate itself at the end of the Compliance Period at a formulaic price.

52.     Traditionally, and in these cases, the investor limited partners do not expect, nor project, any cash payment at the exercise of the purchase option that includes, or even considers, the return of its capital contribution to the Partnerships or related capital account balances.  For example, the financial forecasts prepared by the ILP, as attached as Exhibit 2 to the Partnership Agreements, provided for a write off of the ILP's capital account balance at the end of the Compliance Period, and thus did not project any income to the Limited Partners considering the purchase option.

53.     In this case, Urban invested in and took on considerable risk with the Partnerships and dutifully served as the general partner of the Florence I Partnership and, directly and through an affiliate with common control, the Florence II Partnership with these aforementioned understandings and expectations.

54.     Without the Purchase Options and the parties' agreements that the Purchase Option price would not include, or even consider, the return of the Limited Partners' capital contribution to the Partnerships or related capital account balances, Urban and its affiliate would have much less incentive to participate in, and otherwise would not have participated in, the development of the low-income housing and would otherwise be deprived of an economic right to which the Limited Partners had agreed at inception.

## II.     Wentwood is an Aggregator Within the LIHTC Industry.

55.     Wentwood is what is known throughout the LIHTC industry as an "aggregator":

> Recently, however, a number of private firms have been challenging LIHTC project transfer rights across the country as a way of obtaining additional profit from these deals at the back end [*i.e.*, after the 15-year compliance period closes]. These firms appear to be aggregating investor interests in LIHTC partnerships; asserting

> myriad claims and arguments against project transfers, including transfers to nonprofits; and extracting value from the project or nonprofit in the shadow of protracted litigation. As noted, some in the LIHTC industry have dubbed these firms "aggregators."

*Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance Commission, p. 5 (September 2019), http://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf (last visited April 7, 2020) (observing that firms like Wentwood often use burdensome tactics, like litigation, to take advantage of resource disparities in order to leverage economies of scale in hopes of overwhelming their counterparts and preventing rights like the Purchase Options, as defined herein).  A true and correct copy of the report detailing such activities is attached here as **Exhibit C**.

56.     In fact, Wentwood and its in-house counsel, among others, were recently sanctioned in another LIHTC-related litigation involving an affiliate of Urban, and related to a dispute arising out of Wentwood's interference with the transfer rights under the partnership agreements of two other LIHTC projects.  *See Urban 8 Fox Lake Corporation, et al. v. Nationwide Affordable Housing Fund 4, LLC, et al.*, Case No. 18 C 6109, 2020 WL 201065 (N.D. Ill. Jan. 13, 2020).

57.     On its website, Wentwood boasts of such activity when it promotes itself as an "aggressive" manager of LIHTC investments to maximize its investor's equity investments.  In particular, Wentwood aligns its interest with its investors, not the underlying objectives of the LIHTC program or corresponding projects (such as the Projects here).  Wentwood calls these activities "The Wentwood Advantage" and claims to have produced millions in receivables and settlement funds from "enforcing" the terms of various LIHTC limited partnership agreements (which it undoubtedly will claim it is doing here).  These tactics impact LIHTC projects throughout

the United States due to Wentwood's self-described investment portfolio with properties located in 42 states, Washington D.C. and Puerto Rico.

58.     The business strategies have produced the parties' disputes here and resulted in this litigation.

**III.     The Projects and the Partnership Agreements.**

59.     In 2004, the Partnerships were initially organized to acquire, rehabilitate, develop, improve, own, maintain, and operate the Projects.

60.     The Projects were to be acquired, developed, and operated in such a manner as to qualify for the Tax Credits.

61.     Pursuant to the Partnership Agreements, in 2005, the predecessor to Nationwide Affordable Housing Fund 27, LLC, was admitted to the Partnerships as the Investor Limited Partner and SCDC, LLC was admitted as the Special Limited Partner.  The terms of the Partnership Agreements set forth the various obligations and duties of the general partners and limited partners, including Urban and the Limited Partners.

62.     The Partnership Agreements include an option for Urban to purchase the Limited Partners' interests in the Partnerships as a going concern following the end of the Compliance Period (the "Purchase Options").

63.     Section 6.5.H of the Florence I Partnership Agreement provides, in relevant part:

> The General Partner shall have the right to purchase the Interests of the Limited Partners during the nine (9) month period immediately following the Compliance Period, at a price equal to fair market value of the Interests as established by a mutually agreeable appraisal.

64.     Section 6.5.H of the Florence II Partnership Agreement provides Urban with an identical right, but for the reference to "General Partner" is swapped out for "Class B Limited Partner" due to Urban's specific interest in the Florence II Partnership, although the Florence II

GP is an affiliate sharing common control with Urban. Section 6.5.H of the Florence II Partnership Agreement provides, in relevant part:

> The Class B Limited Partner shall have the right to purchase the Interests of the Limited Partners during the nine (9) month period immediately following the Compliance Period, at a price equal to fair market value of the Interests as established by a mutually agreeable appraisal.

65.     The Purchase Options provide Urban with the right to purchase the Limited Partners' interests in the Partnerships. The purchase price is equal to the fair market value of the Limited Partners' interests in the Partnerships as a going concern, and are established by a mutually agreeable appraisal of the Projects.

66.     Because the Purchase Option provides Urban with the right to purchase the Limited Partners' interest in the Partnerships as a going concern, the Purchase Options are transactions that occur outside of the Partnerships and, therefore, do not generate capital transaction proceeds and are not capital transactions, as defined under the Partnership Agreements:

> [A]ny transaction or other source of funds the proceeds of which are not includable in determining Cash Flow including, without implied limitation, the sale or other disposition of all or substantially all of the assets of the Partnership and any refinancing of any Mortgage, but excluding the payment of Capital Contributions by the Partners.

67.     The Partnership Agreements also provide the Special Limited Partner with a right to force Urban to sell the Projects, but only if the Purchase Option for each respective Project has not been exercised within the requisite Purchase Option period, *i.e.*, nine months following the close of the Compliance Period (the "Forced Sale Rights").

68.     Section 6.5.H of the Florence I Partnership Agreement provides, in relevant part:

> If the General Partner fails to purchase the Interests of the Limited Partners pursuant to the preceding sentences of this Section 6.5H, at any time ***after the expiration of the said nine (9) month period***: (i) the General Partners shall offer the Property for sale if requested to do so by the Special Limited Partner, and (ii) the Special Limited

14

Partner shall be permitted to commence marketing the Property and obtain offers to purchase the Property. If such a sale shall not be approved by the Partners and consummated within one year after the Special Limited Partner requests that the General Partner offer the Property for sale (or one year after the Special Limited Partner begins marketing the Property for sale) (the "Marketing Period"), then, the General Partners and the Special Limited Partners shall use reasonable efforts to agree upon the fair market value of the Property. If the General Partners and the Special Limited Partner fail to reach agreement as to the fair market value within 30 days after the end of the Marketing Period, the General Partners and the Special Limited Partner shall each appoint an MAI appraiser within the following 30 days; the two appraisers shall then appoint a third MAI appraiser within the following 10 days; each of the appraisers shall determine the fair market value of the Property, which determinations shall be made within 30 days after the appointment of the third appraiser. "Fair Market Value" for purposes of this Section 6.5.1 shall then be the fair market value agreed upon by the General Partners and the Special Limited Partner, or, in the absence of such agreement, the average of the three determinations of the appraisers. The General Partners shall then have the right to purchase the Partnership Interest of the Limited Partners for a price, payable in cash in full at closing, equal to the cash which would be distributed to the Limited Partners pursuant to Section 5.2.B if the Property were then sold to a third party for Fair Market Value (less reasonable expenses approved by the Special Limited Partner in connection with such sale and assuming that any applicable Sale Preparation Fee is paid in accordance with Section 5.2B), provided that the General Partners gives notice to the Limited Partners of their election to so purchase within 30 days after the determination of Fair Market Value and tender the purchase price within 60 days after giving such notice. . . .

[Emphasis added.]

69.     Section 6.5.H of the Florence II Partnership Agreement provides the Special Limited Partner with an identical right, but for the reference to "General Partner" is swapped out for "Class B Limited Partner" due to Urban's specific interest in the Florence II Partnership, although the Florence II GP is an affiliate sharing common control with Urban.

70.     Once the Purchase Options are exercised, the Forced Sale Rights are extinguished.

### IV. The Current Dispute

71. The Compliance Period for both Projects ended on December 31, 2019.

72. The period in which Urban may exercise the Purchase Options ends on September 30, 2020.

73. On December 19, 2019, in accordance with the Purchase Options, Urban timely provided the Limited Partners with notice that it was exercising the Purchase Options ("Purchase Option Notice"), and also provided a copy of an appraisal report prepared by Newmark Knight Frank ("NKF"), a nationally recognized, KHC-endorsed appraiser with whom, upon information and belief, Wentwood often works, in accordance with Section 6.5.H of the Partnership Agreements (the "Appraisal Reports"). A true and correct copy of the Purchase Option Notice and Appraisal Reports are attached hereto as **Exhibits D and E**.

74. Urban delivered the Purchase Option Notice and Appraisal Reports to Wentwood, as agent for the Limited Partners, in accordance with written directions that Wentwood provided in 2012. On the same date, Urban also sent copies of the materials via e-mail to Tami Holtz, a Vice President and Asset Manager at Wentwood.

75. On December 19, 2019, Ms. Holtz confirmed receipt of the Purchase Option Notice and Appraisal Reports, thus confirming the Purchase Options had been properly exercised.

76. On December 24, 2019, Ms. Holtz again acknowledged that Wentwood had received Urban's Purchase Option Notice and the Appraisal Reports, further recognizing that Urban had duly and properly exercised its rights under the Purchase Options and thus Urban sought to acquire the Limited Partners' interests in the Partnerships within the nine-month option period. In that regard, Ms. Holtz informed Urban that "if need be, the ILP and SLP would agree to extend that period" to close on the acquisition of the Limited Partners' interests in the Partnerships.

16

77.     However, in her December 24th email, Ms. Holtz began, consistent with Wentwood's practices, the process of interfering with the exercise of Urban's rights under the Purchase Options using common aggregator tactics.

78.     First, Ms. Holtz indicated that the Partnership Agreement's reference to a "mutually agreeable appraisal" is different than Urban unilaterally obtaining an appraisal and sending it to the Limited Partners for their approval, although it is not. She wrote, "It would be agreeable to us if we jointly select the appraiser ***and then work together with the appraiser to ensure the valuation is done appropriately***." This position is contrary to the terms of the Partnership Agreements and would require the parties to (a) "jointly select the appraiser," rather than mutually agree upon an appraisal, and (b) coach the appraiser as to how to value the Limited Partners' interests in the Partnerships, rather than allow the appraiser to provide a valuation using standard methods for valuing partnership interests as a going concern (*e.g.*, a discounted cash flow analysis, as NKF did).

79.     Second, Ms. Holtz suggested NKF's methodologies used in the Appraisal Reports were flawed. In particular, Ms. Holtz questioned the Appraisal report's alleged failure to consider "any residual value the purchaser of the ILP interests would be entitled to," although there is no capital transaction occurring and the ILP interest is being valued as a going concern. Therefore, the residual value the ILP would receive in a capital transaction should not be part of the appraisal for purposes of the Purchase Options.

80.     Ms. Holtz also criticized the discount rate used in NKF's cash flow analysis as one "that doesn't appear to make sense to us," but did not provide any further explanation or justification for this conclusory determination.

81.     In February 2020, subsequent discussions occurred, including a phone call with Ms. Holtz on February 6, 2020, as well as emails exchanged on February 12, 2020, and February 14, 2020, between Ms. Holtz and Steve Greenbaum, President of Senior Housing Group LLC and a shareholder of Urban.

82.     During those discussions, Wentwood took the position that regardless of what the Partnership Agreements provide, capital accounts and any reversion value to the ILP and SLP interests must be accounted for in an appraisal, otherwise there would be no mutually agreeable appraisal as otherwise required by the Partnership Agreements.  As such, Wentwood demanded a valuation based upon a hypothetical sale of the Projects, rather than a valuation of the Partnerships as going concerns, even though the appraisal being performed under the Purchase Options does *not* involve a capital transaction.

83.     Notably, following the consummation of the Purchase Options, Urban will own and operate (and intends to continue owning and operating) the Partnerships.  Thus, the Purchase Options provide for transfers of ownership interests that occur outside of the Partnerships (*i.e.*, the Partnerships are not parties whose rights are impacted by the transactions).

84.     Moreover, the financial forecasts attached to the Partnership Agreements as Exhibit 2 do not provide an expectation of any return of capital accounts following the end of the Compliance Period, but, considering the existence of the Purchase Options, anticipate a write-off of any remaining capital account balances following the close of the Compliance Period.

85.     The financial forecasts prepared by the ILP also demonstrate the benefit for which the Limited Partners bargained.  Specifically, for the Florence I Partnership, the Limited Partners anticipated making a total capital contribution of $2,833,727 and, in return, receiving a total benefit

of $4,311,579. For the Florence II Partnership, the Limited Partners anticipated making a total capital contribution of $1,494,080 and, in return, receiving a total benefit of $1,825,181.

86.     Negotiations between Urban and Wentwood proceeded through February, 2020, although the parties were not able to mutually agree on an appraisal.

87.     Then, on March 25, 2020, Brian J. Brandstetter, Assistant General counsel for Wentwood, sent a letter to Urban "to follow up on" a February 26, 2020 phone call between Ms. Holz and Mr. Greenbaum. In this letter, Mr. Brandstetter purported to exercise the SLP's Forced Sale Rights under the Partnership Agreements, despite the fact that the Purchase Options have (a) been exercised; (b) not yet expired pursuant to the nine-month period to exercise the Purchase Options; and (c) extinguished the Forced Sale Options. A copy of Mr. Brandstetter's March 25th letter is attached hereto as **Exhibit E**.

88.     In his March 25th letter, Mr. Brandstetter described the Forced Sale Rights as ripe for exercise because it had been "made clear" to Ms. Holtz "that Urban is unwilling to have a mutually agreeable appraisal performed, and would not be purchasing the Limited Partners' interests at a price established by a mutually agreeable appraisal." This is not true, and is otherwise bad faith conduct similar to Wentwood's aggregator behavior and actions for which Wentwood has been previously sanctioned in litigation. Urban has, in fact, exercised its Purchase Options pursuant to appraisals that should otherwise reasonably be mutually agreed to but for Wentwood and its positions taken to, among other things and also as set-forth in this Complaint, (a) interfere with, frustrate and prevent Urban's rights, and (b) cause the Limited Partners to breach the Partnership Agreements and duties of good faith and fair dealing owed to Urban.

89.     Furthermore, Wentwood and the Limited Partners are taking the position that "a mutually agreeable appraisal" must be conducted using a valuation method for capital transactions

(*e.g.*, a hypothetical sale model), while the Purchase Options and Partnership Agreements clearly provide for a fair market valuation of the Limited Partners' interests in the Partnership ***as a going concern***. Defendants are acting in bad faith by attempting to unilaterally modify the terms of the Partnership Agreements.

90.     Mr. Brandstetter also wrote, again falsely and in bad faith, that "Urban's unequivocal rejection of its option to purchase the Limited Partner's interests at a price set by a mutually agreeable appraisal triggers the Special Limited Partners' right to require that Urban offer the properties for sale." Wentwood and the Limited Partners' position here is in direct conflict with the express language of the Partnership Agreements. Rather, Wentwood and Mr. Brandstetter are, on behalf of Wentwood and the Limited Partners, providing Urban with a false choice: have an appraisal performed based upon a hypothetical sale/capital transaction (which is not occurring under the Purchase Options) or be subjected to the SLP's Forced Sale Right.

91.     Despite being contractually required under the Partnership Agreements to sell their Partnership interests to Urban upon Urban's proper exercise of the Purchase Options, the Limited Partners, by and through Wentwood, have unjustifiably refused to honor Urban's exercise of the Purchase Options by unreasonably claiming, and positing in bad faith, that the Appraisal Report cannot be "mutually agreed upon."

92.     Wentwood and the Limited Partners cannot dispute that NKF is a nationally recognized, reputable appraiser endorsed by the KHC, and that the Appraisal Report uses standard methodologies for valuing fractional interests (*e.g.*, business or ownership interests) in a partnership as a going concern.

93.     Wentwood and the Limited Partners are acting in bad faith, and acting unreasonably.

94.     Upon information and belief, this course of conduct is a pattern replicated by Wentwood, on behalf of itself, the Limited Partners here, and other limited partners, throughout the LIHTC industry in which it has inserted itself in recent years for the express purpose of depriving general partners and their affiliates from achieving the negotiated rights and benefits set-forth in their agreements with Wentwood's predecessors.

95.     Upon information and belief, Wentwood is seeking to extract a large cash payment from Urban after the end of the Compliance Period through the Purchase Options, rather than secure additional tax benefits for the Limited Partners, because it is in Wentwood's own financial best interests to do so.

96.      Upon information and belief, if the price of the Purchase Options include payment of capital account balances, then Wentwood benefits financially from such consideration of capital accounts rather than, or more so, than the Limited Partners.

97.     Upon information and belief, Wentwood is seeking to otherwise prevent the transfer of the Limited Partners' interests to Urban after the end of the Compliance Period and force a sale of the Projects because it is in Wentwood's own financial best interests to do so.

98.     Upon information and belief, if the Forced Sale Process proceeds and results in a sale of the Projects or the Limited Partners' interests are appraised to assume a capital transaction, then Wentwood's own financial best interests are advanced, rather than the financial best interests of the Limited Partners.

99.     Wentwood is trying to, among other things, deprive Urban of its right to exercise the Purchase Options in order to force sales of the Projects and attempt to garner greater financial returns from the disposition of the Projects than were negotiated for by the original parties to the Partnership Agreements.

100. Wentwood has further intentionally and tortiously interfered with the Partnership Agreements by causing the Limited Partners to refuse to honor their obligations under the Partnership Agreements in an attempt to increase financial benefits for itself and/or its affiliates and to the detriment of the Limited Partners.

101. Upon information and belief, Wentwood's compensation is, in part, performance-based.

102. Because the Purchase Options do not involve a capital transaction, the price to be ultimately paid to the Limited Partners pursuant to the Purchase Options, and therefore the amount to be distributed to Wentwood and/or its affiliates as agent/owner of the Limited Partners, pursuant to agreements between and among them, would likely be less than the amount to be paid upon a sale of the Projects.

103. Wentwood is attempting to maximize its own cash payment by artificially and improperly maximizing the cash to be distributed upon sale of the Limited Partner interests to Urban, and upon disposition of the Partnerships and/or Projects in order to maximize payments to itself and/or its affiliates, at the expense of Urban and the Limited Partners who bargained for tax credits and related benefits when they entered the Partnerships, not for cash distributions following the close of the Compliance Period.

104. Wentwood's conduct is to the detriment of the Limited Partners, and its actions are not consistent with the conduct required by a supposed agent for an alleged principal.

105. Wentwood is not, because of its misconduct, entitled to hide behind an alleged agent/principal relationship or privilege to insulate itself from liability.

106.     Even if Wentwood was advancing the Limited Partners' economic best interests, although it is not, its conduct would still be causing a breach of the terms of the Partnership Agreements.

## LEGAL CLAIMS

### COUNT I
### BREACH OF PARTNERSHIP AGREEMENTS AND
### DUTY OF GOOD FAITH AND FAIR DEALING
### (Against the ILP and SLP)

107.     Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.

108.     The Partnership Agreements are valid and binding contracts.

109.     The Partnership Agreements include Purchase Options, for which Urban provided sufficient consideration.

110.     Urban unconditionally exercised its Purchase Options, creating contracts for sale of the Limited Partners' interests in the Partnerships to Urban.

111.     The Limited Partners are obligated under the Partnership Agreements to facilitate the sale of the Limited Partners' interests in the Partnerships to Urban upon Urban's exercise of the Purchase Options.

112.     The Limited Partners have breached their contractual obligations, including the duty of good faith and fair dealing, among other obligations, by failing to facilitate the sale of the Limited Partners' interests in the Partnerships upon Urban's valid exercise of the Purchase Options.

113.     The Limited Partners have breached their contractual obligations, including the duty of good faith and fair dealing, to sell their interests in the Partnerships to Urban based upon mutually agreed upon appraisals by refusing to reasonably agree upon an appraisal.

114. The Limited Partners have further breached their obligations of good faith and fair dealing by refusing to deal fairly with Urban in connection with its exercise of the Purchase Options by, among other things, attempting to frustrate Urban's exercise of the Purchase Options by demanding objectively unreasonable terms before agreeing to any appraisal, such as valuing the Partnerships using a hypothetical sale of the Projects even though the Purchase Options do not provide for a capital transaction involving the Projects to occur.

115. Urban is entitled to, among other things, an order for specific performance requiring the Limited Partners to transfer their interests in the Partnerships to Urban in accordance with the terms of the Purchase Options under the Partnership Agreements.

116. Urban is also entitled to award of damages against the Limited Partners in an amount exceeding $75,000, the precise amount to be determined at trial.

**COUNT II**
**DECLARATORY JUDGMENT**
**735 ILCS § 5/2-701**
**(Against the ILP and SLP)**

117. Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.

118. An actual controversy exists as to the Limited Partners' contractual obligations to perform pursuant to the Partnership Agreements.

119. An actual controversy also exists as to objective reasonableness of the Limited Partners' demands that (a) the parties agree on an appraiser, not just an appraisal, and (b) the appraiser value the Partnerships as if a capital transaction is occurring, although the Purchase Options do not provide for a capital transaction involving the Projects.

120. An actual controversy also exists as to the Forced Sale Rights, pursuant to which, on the one hand, Urban claims have been extinguished by the exercise of the Purchase Options or

otherwise may not be pursued by the Limited Partners under the circumstances that exist and, on the other hand, the Limited Partners claim may be enforced.

121.    The Partnership Agreements are valid and binding contracts.

122.    The Partnership Agreements include Purchase Options, for which Urban provided sufficient consideration.

123.    Urban unconditionally exercised its Purchase Options, creating a contract for sale of the Limited Partners' interests in each Partnership to Urban.

124.    The Limited Partners are required by each Partnership Agreement to facilitate the sale of the Limited Partners' interests in the Partnerships upon Urban's exercise of the Purchase Options.

125.    The Limited Partners breached their contractual obligations, including the duty of good faith and fair dealing, to sell their interests to Urban by unjustifiably and unreasonably refusing to sell their Partnership interests pursuant to the Purchase Options as required by the Partnership Agreements.

126.    Plaintiff is entitled to a declaration under 735 ILCS § 5/2-701 that:

     a.     Urban's exercise of its Purchase Options are valid and enforceable;

     b.     The Limited Partners' demands that (a) the parties agree on an appraiser, not just an appraisal, and (b) the appraiser value the Partnerships as if a capital transaction is occurring, although the Purchase Options do not provide for a capital transaction involving the Projects, are unreasonable and therefore constitute a breach of the Partnership Agreements and duties of good faith and fair dealing;

     c.     The Limited Partners must promptly transfer their Partnership interests to Urban pursuant to the Purchase Options for consideration, if any, in accordance with the terms of the Partnership Agreements; and

     d.     The Forced Sale Rights have been extinguished by the exercise of the Purchase Options and otherwise may not be pursued by the

Limited Partners under the circumstances that exit between the parties.

## COUNT III
## TORTIOUS INTERFERENCE WITH PARTNERSHIP AGREEMENTS
### (Against Wentwood)

127. Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.

128. The Partnership Agreements are valid and enforceable contracts between Urban and the Limited Partners.

129. Wentwood is aware of the Partnership Agreements and the Limited Partners' duties and obligations thereunder.

130. Wentwood, as owner/agent of the Limited Partners, has a material conflict of interest in Urban's exercise of the Purchase Options because, upon information and belief, Wentwood stands to collect significantly more money from a sale of the Projects to a third party rather than a sale of the Limited Partners' interests pursuant to the Purchase Options, and Wentwood is attempting to maximize its financial return from the sale of the Projects or improper increase in the prices of the Purchase Option solely in its own economic self-interest and despite such actions being contrary to the best interests of the Limited Partners.

131. Through its ownership and/or management of the Limited Partners, Wentwood intentionally and unjustifiably caused the Limited Partners to breach the Partnership Agreements by, among other things, preventing the Limited Partners from facilitating Urban's exercise of the Purchase Options and refusing to facilitate the transfer of the Limited Partners' interests to Urban pursuant to the Purchase Options.

132. As a result of Wentwood's tortious interference with the Partnership Agreements, Urban has suffered damages.

26

133.    Urban is entitled to award of damages against Wentwood in an amount exceeding $75,000, the precise amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    That the Court find that the Limited Partners breached the Partnership Agreements and their duties of good faith and fair dealing owed to Urban, and order specific performance requiring the Limited Partners to transfer their interests to Urban pursuant to the Purchase Options in accordance with the terms of the Partnership Agreements.

2.    That the Court find and declare that Plaintiff is entitled to a declaration under 735 ILCS § 5/2-701 that:

   a.   Urban's exercise of its Purchase Options are valid and enforceable;

   b.   The Limited Partners' demands that (a) the parties agree on an appraiser, not just an appraisal, and (b) the appraiser value the Partnerships as if a capital transaction is occurring, although the Purchase Options do not provide for a capital transaction involving the Projects, are unreasonable and therefore constitute a breach of the Partnership Agreements and duties of good faith and fair dealing;

   c.   The Limited Partners must promptly transfer their Partnership interests to Urban pursuant to the Purchase Options for consideration, if any, in accordance with the terms of the Partnership Agreements; and

   d.   The Forced Sale Rights have been extinguished by the exercise of the Purchase Options and otherwise may not be pursued by the Limited Partners under the circumstances that exit between the parties.

3.    That the Court award damages to Urban in an amount exceeding $75,000, the precise amount to be determined at trial.

4.    That the Court order such other and further relief, including, without limitation, monetary relief and attorneys' fees and costs, which the Court may deem just, equitable and appropriate under the circumstances presented.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: April 9, 2020

Respectfully submitted,

*s/ Caitlin Martini Mika*
Caitlin Martini Mika
ARNOLD & PORTER
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Tel: (312) 583-2300
Caitlin.Mika@arnoldporter.com

-and-

David A. Davenport
(*pro hac vice to be submitted*)
Sean M. Zaroogian
(*pro hac vice to be submitted*)
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
ddavenport@winthrop.com
szaroogian@winthrop.com

***Attorneys for Plaintiffs***

19027819v4

## **CERTIFICATE OF SERVICE**

On April 9, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ *Caitlin Martini Mika*
Attorney for Plaintiff